**MERRISA L. COLEMAN-BISHOP**, State Bar No. 160046
LAW OFFICE OF MERRISA L. COLEMAN-BISHOP
e-mail: MerrisaSJC@aol.com
2242 Camden Ave., Suite 105
San Jose, CA 95124
Telephone:   408-377-1368
Facsimile:   408-377-1439
**ROY B. THOMPSON**, OSB 82501 (*pro hac vice*)
THOMPSON & BOGRÁN, P.C.
E-mail: roythompson@comcast.net
15938 SW Quarry Rd., Suite B-6
Lake Oswego, OR 97035
Telephone:   503-245-6600
Facsimile:   503-244-8399
**MARK S. HUBERT,** OSB 98256 (*pro hac vice*)
MARK S. HUBERT, P.C.
e-mail: MarkHubert@pacifier.com
2300 SW First, Suite 101
Portland, OR 97201
Telephone:   503-234-7711
Facsimile:   503-224-0092
        Attorneys for The Hoffman Group, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Santa Ana)

| | |
|---|---|
| Vertical Doors, Inc., a California corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>Matthew Howitt, et al.,<br>        Defendants. | **Case No. SA-CV-06-984 JVS (ANx) consolidated with:**<br>**Case No. SA-CV-07-275-JVS (ANx)**<br>**THG'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Declaration of Invalidity of '655 Patent)**<br>    Tentative Setting:<br>October 18, 2010 - 1:30 p.m.<br>Courtroom 10C<br>The Honorable James V. Selna |

The Hoffman Group LLC ("THG") hereby submits the following Memorandum of Points and Authorities in support of THG's Motion for Partial Summary Judgment of Invalidity of Claims 1, 2, 3, 6, 9, 13, 16, 17 and 19 of U.S. Patent No. 7,059,655 ("the '655 Patent"). This Memorandum is accompanied by a Statement of Material Uncontested Facts, and is supported by the Declaration of Mark Hubert, the Declaration of Gary Gilbertson, and by the Exhibits filed herewith.

# I. INTRODUCTION

This case revolves a dispute between three manufacturers of car door hinges that open much like that of a Lamborghini ("Lambo hinges"). These hinge kits convert "normal" car doors to vertically opening car doors. Two of the parties owns numerous patents on different variations of this type of hinge that they manufacture and sell. The other has invented, manufactured and sold Lambo hinges without receiving any patents to date, on his inventions.

By mid 2000, Daniel Greenbank of Street Weapon Composites (now GT Factory) designed, fabricated and commercially installed his own style of vertically opening automotive door hinges on his client's vehicles. He applied for a patent but due to an undiscovered illness of his patent attorney, Greenbank's patent application went abandoned before the US Patent Office. More than a year later, VDI's predecessor in interest (Demetrius Calvin Ham) applied for and received a patent on his design of a Lambo hinge. Shortly thereafter Andrew Hoffman made radical design and operational improvements to a style of hinge like Daniel Greenbank's and filed and receive patents thereon.

Upon the issue of his Lambo hinge patent Demetrius Ham sued Vertical Doors Inc for infringement of the '547 patent. This case was settled before trial with VDI purchasing the related patents from Ham. A important point here is that during the litigation between Demetrius Ham and VDI, representatives from VDI testified in depositions to having seen Lambo style hinges possibly the Greenbank hinges, or something quite similar.

In the present consolidated action several Vertical Doors, Inc. ("VDI") patents (U.S. Patent Nos. 6,845,547, 7,059,655, and 7,140,075 - the '547, '655 and '075 patents) are at issue.  The '547 patent is the parent patent and the '655 and '075 patents are respectively, a divisional and a continuation in part from the '547.  These three patents are interrelated in that the '547 patent is an apparatus patent for VDI's hinge, the '655 patent is a method patent how to install and how to open VDI's hinge and the '075 patent is an apparatus patent of a retrofit kit with the VDI hinge.

THG is only moving against the validity of the allegedly infringing claims of the '655 Patent herein, although the '075 patent also remains in issue.

**All that is at issue in this Motion for Partial Summary Judgment is the '655 Patent; THG seeks a Declaration of Invalidity, as contained in its Answer, Affirmative Defenses and Counterclaims filed herein.** (Dkt. 80).

Last year, VDI filed a Motion for Summary Judgment alleging infringement of claims 8-10 of the '547 patent by THG.  THG filed a Cross Motion for Invalidation.  The Court found that THG did infringe claims 8-10 of the '547 Patent but found no liability since these same three claims were all invalidated.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."  FRCivP 56(c). "[S]ummary judgment under Rule 56, Fed. R. Civ. P., is entirely appropriate, in a patent as in any other case ..." *SRI Int't. v. Matsushita Elec. Corp.,* 775 F2d 1107, 1116 (Fed.Cir. 1985). "The Court has the authority to grant summary judgment on specific issues and need not adjudicate all of the claims in the case."  *Nobell, Inc. v. Sharper Image Corp.,* 24 USPQ2d 1919 (N.D. Cal. 1992).  This general rule applies equally to patent cases.   *Id.; see also Syntex Pharmaceuticals Int'l., Ltd. v. K-Line Pharmaceuticals, Ltd.,* 905 F2d 1525 (Fed.Cir. 1990) (summary judgment granted on infringement issues but trial held on validity

issues); *Moxness Products, Inc. v. Xomed, Inc.,* 891 F2d 890 (Fed.Cir. 1989) (partial summary judgment entered on infringement but validity, intent and materiality tried before jury).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex v. Catrett,* 477 US 317, 323 (1986); *Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F3d 795, 806-7 (Fed.Cir. 1999). Once the moving party carries its initial burden, the adverse party must provide evidence that sets forth specific facts showing that there is a genuine issue of material fact and may not simply rely upon mere allegations or denials of the adverse party's pleadings. FRCivP 56(e).

As the old Claims Court recognized, the court must accord special attention to summary judgment in patent cases. While these traditional standards of RUSCC [subsequently RCFC] 56(b) are fully applicable to patent suits, *Howes v. Medical Components, Inc.*, 814 F2d 638, 643 (Fed.Cir. 1987); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F2d 1107, 1116 (Fed.Cir. 1985), the Federal Circuit has cautioned that summary judgment on the issue of infringement must be approached with care. *Palumbo v. Don-Joy Co.*, 762 F2d 969, 974 (Fed.Cir. 1985). Indeed, because the ultimate determination of infringement (in contrast to the initial interpretation of the claim) is itself a fact issue, this court must approach a motion for summary judgment with care proportioned to the likelihood of its being appropriate. *Chemical Eng'g Corp. v. Essef Indus., Inc.*, 795 F2d 1565, 1571 (Fed.Cir. 1986).

## III. LAW OF PATENT INVALIDITY

There is a presumption, or the presumption in favor of, or deference granted to, the findings of the PTO. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F2d 1350, 1358-59 (FedCir, 1984), *cert. den.* 469 US 821. Yet, where the party challenging the validity of the patent presents prior art not considered by the PTO in the issuance of the patent-in-suit, any presumption or deference to the findings of the PTO ends. The Federal Circuit explained this dichotomy as follows: "When an

attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence not considered in the PTO, there is, however, no reason to defer to the PTO so far as its effect on validity is concerned.  . . .  When an attacker simply goes over the same ground travelled by the PTO, part of the burden is to show that the PTO was wrong in its decision to grant the patent.  When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account." *Id.* at 1359-60.

## 1.   Claim Construction

Patent claims should be construed as they would be by those skilled in the art. *Muntiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F3d 1473, 45 USPQ2d 1429, 1432 (Fed.Cir. 1998).  To ascertain the true meaning of the claims, it is appropriate to consider the claim language, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F3d 967, 979-980 (Fed.Cir. 1995), *aff'd,* 517 US 370 (1996); *General Am. Transp. Co. v. Cryo-Trans, Inc.*, 93 F3d 766, 769 (Fed.Cir. 1997), *cert. den.*, 520 US 1155 (1997).

## 2.   Presumption of Validity

A U.S. Patent is presumed to be valid.  35 USC §282. The presumption of validity "places the burden of proof of facts, and the ultimate burden of persuasion to establish invalidity," on the challenger.  *Smith-Kline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F2d 878, 885 (Fed.Cir. 1988).  In general, a party challenging the validity of a patent must establish its invalidity by clear and convincing evidence.  *Lindemann Machinenfabrik GmbH v. American Hoist and Derrick Co.*, 730 F2d 1452, 1459 (Fed.Cir. 1984).  Moreover, each claim of a patent is presumed valid independent of the validity or invalidity of other claims.  *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F2d 443, 446 (Fed.Cir. 1986), cert. den. 484 US 823 (1987).

///////

### 3.     Anticipation

A single prior art reference that discloses, either expressly or inherently, every limitation of a patent claim invalidates that claim by anticipation. *Perricon v. Medicis Pharm. Corp.*, 432 F3d 1368, 1375 (FedCir, 2005).   If the reference fails to suggest even one limitation of the claimed invention, then the claim is not anticipated. *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F2d 1569, 1574 (Fed.Cir. 1984). Under §102(a), a patent is invalid if "the invention was known or used by others in this country ... before the invention thereof by the applicant." Under §102(b), a patent is invalid if "the invention was ... in public use or on sale in this country more than one year prior to the date of the application for patent in the United States."

### 4.     Obviousness

Under 35 USC §103, the subject matter of a claim considered obvious, and therefore invalid, when the claimed "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." In *KSR International Co. v. Teleflex Inc.*, 550 US 398, (2007) the Court further developed what a person having ordinary skill in the art was and then with that properly defined, described how obviousness should be determined.

Justice Kennedy's opinion stated, "A person of ordinary skill is also a person of ordinary creativity, not an automaton." Although the Court's opinion acknowledged other Federal Circuit cases that described a PHOSITA as having "common sense" and who could find motivation "implicitly in the prior art,"

KSR further ruled that in determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under §103. One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed

by the patent's claims.

The proper question to ask when determining whether obviousness exists is whether a person of ordinary skill, facing the needs created in the field of endeavor, would have seen a benefit to modifying any of the prior art (alone or in combination) to arrive at their invention.  A claimed invention is unpatentable if the differences between the prior art and the claimed invention "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which subject matter pertains.  35 USC §103(a); *Graham v. John Deere Co.*, 383 US 1, 13-14 (1966).  Obviousness is a question of law.  *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F3d 1317, 1323 (Fed.Cir. 2004).

It is not necessary that the prior art specifically suggest making the combination. *In re Nilssen*, 851 F2d 1401m 1403 (Fed.Cir. 1988).  Such suggestion or motivation to combine prior art teachings derive solely from the existence of a teaching, which one of ordinary skill in the art would be presumed to know, and the use of that teaching to solve the same or similar product that it addresses. *In re Wood*, 599 F2d 1032, 1036-37 (CCPA 1979).

## 5.    Indefiniteness

The definiteness analysis requires a determination of "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n,* 161 F3d 696, 705 (Fed.Cir.1998) (quoting *Miles Labs., Inc. v. Shandon, Inc.*, 997 F2d 870, 875 (Fed.Cir.1993)). "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Res. & Eng'g Co. v. United States,* 265 F3d 1371, 1375 (Fed.Cir. 2001).  Definiteness is a question of law, reviewed de novo.  *Id.* at 1376.

///////

## 6.    Non-enablement

**Page 7 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

Where the claims of a patent fail to teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation, the patent is invalid for lack of enablement. *Automotive Technologies International, Inc. v. BMW of North America, Inc.*, 501 F3d 1274, 1280 (Fed.Cir. 2007).

**7.    Inherency**

Inherency is predicated on the fact that anticipation cannot be avoided merely because an element is undisclosed and unrecognized in the reference, but is a "deliberate or necessary consequence" of the reference's disclosure.   Donald S. Chisum, *Chisum on Patents* §3.03.   Described another way, an inherent disclosure flows naturally from the teachings of the prior art reference. *MEHL v. Biophile Int'l. Corp.*, 192 F3d 1362, 1365 (Fed.Cir. 1999).   The Federal Circuit analyzes inherent disclosures on the basis of requiring an inherency to be "necessarily present" and not merely sometimes, occasionally, or possibly present. *See generally* Chisum, *supra* note 2, at § 3.03[2][b].

At the patent prosecution stage, the United States Patent and Trademark Office similarly requires an examiner to supply an applicant either with a rationale for the inherent disclosure or evidence demonstrating the presence of the inherency. United States Patent and Trademark Office, *Manual of Patent Examining Procedures* §2112 (8th Ed. 1st Rev., Feb. 2003).

## IV. THE '655 PATENT

The subject matter of the '655 patent is to a method of opening a vehicle door with a customized hinge or installing a customized vehicle door hinge. U.S. Patent 7,059,655, Vertical Door Conversion Kit, was filed with the U.S. Patent and Trademark Office (USPTO) on November 24, 2003.  It is a divisional patent of US Patent 6,845,547 which was filed November 26, 2002.  (SOF 1) This filing claimed priority under 35 USC 119(e) from an earlier provisional patent application filing of May 20, 2002.  (SOF 2)   The date one year before the effective filing date is referred to as "the critical reference date.   MPEP  §2136.03   Here, this date would  May 19,

2001.  However, in this action pursuant to VDI's PLR 3-1 Disclosure of Asserted Claims and Preliminary Infringement Contentions, VDI is not "claiming priority to the earlier-filed provisional application Serial No. 60/382,281 for claims 8 - 10." (SOF 3)   Since the '655 patent claims how to operate and install the same hinges originally disclosed in the '547 patent we must assume that the critical date here is November 25, 2001 although VDI could argue that it is May 19, 2001.

The claims of the '655 Patent at issue here are all method (or process) claims and contain a series of sequential steps to use or install the VDI hinge in a vehicle. Claim 1 is being contested at this time, as it pertains to a way of opening a vehicle door, and is included in the listing of claims as it is the independent claim from which claims 2, 3 and 6 depend.

## Claim 1 Invalidity

Claim 1 reads:

1.    A **method** of opening a vehicle door in a doorway of a vehicle body, the method comprising:

rotating the vehicle door in a horizontal plane of motion until the vehicle door substantially clears the vehicle body; and

then rotating the vehicle door in a vertical plane of motion until the vehicle door substantially clears the doorway

Claim 1 is invalid for several reasons.  It is anticipated under 35 USC §102 (a) and (b) by U.S. Patent No. 2,374,697 (Pallisano).  It is anticipated under 35 USC §102 (a) and (b) by the Street Weapon Composite hinge.  It is admittedly anticipated by the testimony of the patent owners.  It is obvious under 35 USC § 103 by U.S. Patent No. 1,065,406 (Swinford).   It is obvious under 35 USC § 103 by U.S. Patent No. 5,184,422 (Wade et al)  Lastly, It is obvious under 35 USC §103 and (b) by U.S. Patent No. 4,944,552 (Harris)[1]

[1] It is notable that none of the obviousness arguments herein rely on more than one prior art patent and none of these cited references were looked at during

**Page 9 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

Between the claim construction order in this case and the clarity of the plain language of the '655 claims and the cited prior art, THG does not deem expert testimony necessary here to establish that the prior art references either anticipate or teach each and every element of Claim 1 of the '655 patent. Claim construction is "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.,* 517 US 370, 372 (1996). The Court has wide discretion regarding when to make claim construction rulings. *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F3d 1168, 1172-73 (Fed.Cir. 2005).

Putting Claim 1 of the '655 Patent into plain language, it describes a vehicle door opening first horizontally out like a regular car door, then vertically upward toward the front of the car.

Anticipation by The '697 Patent

Prior U.S. Patent No. 2,374,697, filed March 11, 1944, issued/published May 1, 1945 -Tail Gate (Palisano) (Exhibit 4 of the Declaration of Mark Hubert) anticipates claim 1. This prior art was **not** considered by the patent examiner in issuing the '655 Patent as is clear on the face of the '655 patent under the heading "References Cited.". (SOF 4) This patent discloses a tailgate (vehicle door) in a doorway of a vehicle body (a tailgate in an enclosed commercial van) that operates by rotating in a horizontal plane until it clears structural obstacles of the vehicle's body and then rotating in a vertical plane until it clears the doorway opening.

The '697 specification at COL 1 Lines 33 - 44 states: "In the form illustrated here by way of example the tail gate has a pair of companion panels, one secured to each side of the rear opening of a commercial vehicle by a vertical hinge so that it may be moved pivotally inwardly or outwardly. Each panel is further provided with a pivotal support adjacent to its upper edge and also adjacent to the vertical hinge. Such

---

the US Patent Office's examination. These obviousness references are strong enough to teach the claims of the '655 patent without combination of other references
.

**Page 10 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

second pivot has an axis extending longitudinally of the vehicle whereby each of the pair of tail gate panels may be swung upwardly and toward the side of the vehicle upon which it is supported."

The '697 Patent provides a two-axis hinge for a vehicle door and a method of opening the vehicle door of a vehicle that provides pivotal motion of a door about a first axis to permit rotation of the door in a horizontal plane and pivotal motion of the door about the second axis perpendicular to the first axis to permit rotation of the door in a vertical plane.

The '697 Patent clearly shows a vehicle door 14/15 in a doorway 11 of a vehicle body 10, where in Fig. 1 the door 15 is shown rotated in a horizontal plane of motion until the door 14/15 substantially clears the vehicle body 10, and in Figs 2 and 3 the door 14/15 is shown rotated in a vertical plane of motion until the door 14/15 substantially clears the doorway 10.  This anticipates the method of opening a vehicle door by rotation in a horizontal plane of motion until the door substantially clears the vehicle body, and the rotation in a vertical plane of motion until the door substantially clears the doorway.  Door 14 and door 15 operate in the same way but close the opposite sides of the doorway 10.  The '697 Patent clearly anticipates the method steps of opening a vehicle door of Claim 1 of the '655 Patent.

Anticipation by the Street Weapon Composite Hinges

Under 102(b), if the claimed invention was in public use or on sale in this country more than one year prior to the filing date, the patent is invalid.  35 USC § 102(b)   Under § 102(a) if the claimed invention was known or used by others in this country before the invention thereof by the applicant, the patent is invalid.  35 USC § 102(a)  The date given as the date of the purported invention is the filing date of the patent unless the applicant meets his burden of proof offering evidence showing an earlier date of purported invention.  See *Mahurkar v. C.R. Bard, Inc*., 79 F3d 1572, 1576-1577 (Fed. Cir. 1996.)  Here the date of the purported invention is November

26, 2002[2] (SOF 4)  Thus, prior art in public use or on sale before November 25, 2001 will invalidate the '547 Patent under §102(a) if this date of purported invention is not rebutted and prior art before November 25, 2001 will absolutely invalidate the '547 Patent under §102(b).

That which would literally infringe if later in time, anticipates if earlier than the date of the invention.  *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F2d 744, 747 (FedCir, 1987).   A single prior art reference that discloses, either expressly or inherently, every limitation of a patent claim invalidates that claim by anticipation.  *Perricon v. Medicis Pharm. Corp.*, 432 F3d 1368, 1375 (FedCir, 2005).  To invalidate claims 8 - 10 of the '547 patent as anticipated under 35 USC § 102 requires two steps; first the prior art must be earlier in time[3] and second the prior art must be shown to have all the limitations of each separate claim **or** admittedly infringe the claim (which eliminates the element by element test.)   It is an uncontroverted fact that the Street Weapon Composite hinge, sold and installed by Daniel Greenbank and/or Chaser Aerodynamics infringes claims 8 - 10 of the '547 patent.   VDI has pled this in their Complaint and VDI has performed a comparison between the GT Factory hinge and the claim elements of claims 8 - 10 of the '547 Patent in their Preliminary Contentions of Invalidity that THG does not controvert.  (SOF 5)  Therefore, the Street Weapons Composite hinge must by definition "have all the limitations of each separate claim." Since the '655 patent is a divisional of the '547 patent and deals with just a method of opening the  hinge disclosed in the '547 and '655 patents, the elements of the method Claim 1 of the '655 patent are inherently taught in the structure of the Street Weapons Composite hinge.  What remains to be proven to invalidate claim 1 of the '655 Patent under 35 USC §102(b) is that the Street Weapons Composite hinge was

_____

[2]  Although it would have been May 20, 2001 if priority from the provisional application had been claimed.

[3] Either by one year for anticipation by §102(b) or by 1 day for anticipation by §102(a).

**Page 12 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

in public use or on sale in the US before November 25, 2001 (or November 25, 2002 for a 35 USC §102(a) anticipation.)

In 2000 Daniel Greenbank founded a company called Street Weapon Composites which customized automobiles.  (This company later became what is today known as GT Factory.)  (SOF 6)  In May 2000 he was approached by a Ms. Lisa Mai with the idea of converting the doors on her Toyota Supra into "Lambo doors." (SOF 7)  Greenbank visited a Lamborghini store to study the motion of a "Lambo hinge" and took photographs.  (SOF 8)   From that point on Greenbank worked on a hinge that opened horizontally and then vertically rather than on an angle like that of a Lamborghini hinge.  In his November 27, 2007 deposition at page 51 line 22 to page 52 line 16 (Exhibit 5) he states in reference to questions asked by Mr. Roy Thompson, counsel for THG:

MR. THOMPSON

    Q: Okay. So recognizing that the Lamborghini hinge couldn't be adapted to the Supra, what did you do?

DANIEL GREENBANK

    A: Well, what was immediately obvious upon viewing the Lamborghini itself is that the door of the car, the chassis, the entire vehicle itself – the latch, the hinge, everything about this vehicle -- was designed so that the door could go straight up. And everything about the Supra was designed so that the door could go horizontal. So it was immediately obvious that we would have to make a bidirectional hinge that would first go horizontal to accommodate all of the things that were built into the Supra from the factory and then go up as the customer had requested to mimic the look of the Lamborghini.

    Q: Okay. So for me as a layperson, when you  describe first horizontal, you mean the door would go out, and then the door would go up?

    A: Correct.

    Q: Okay.

**Page 13 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

A: So our goal was to make the door go essentially in an L-shape motion out, then up.

Lisa Mai dropped off her car on June 30, 2000 to have the Lambo hinges installed and paid an $800 deposit by a VISA credit card which was noted in the corner of her invoice. (SOF 9)  Thereafter, between June 30, 2000 and August 11, 2000 Greenbank developed and installed his own hinge that would simulate the Lamorghini door opening and took photographs to document its building along the way.  (SOF 10)   On August 11, 2000 the Street Weapons Composite  hinges were installed and Lisa Mai picked up her car and paid the balance of the invoice which is indicated in the middle of the invoice.  (SOF 11)   By August 11, 2000 Daniel Greenbank had designed, made, installed and sold a fully operational set of Street Weapons Composite hinge (Lambo door hinges.)  (SOF 12)

Greenbank made and installed another set of Street Weapons Composite hinges on a Nissan 300Z for Victor Thanapanich between the dates of May 21, 2001 and July 1, 2001.  (SOF 13) Victor's invoice shows he paid a deposit on April 21, 2001, a further payment by VISA on June 6, 2001 and a final payment when he picked up his car on July 1, 2001.  (SOF 14)   By May 15, 2001 Street Weapon Composites had a website running that advertised the Lambo style hinges for sale as Street Weapon kits that brought a customer named Akhil Narang to purchase a set of these hinges.  (SOF 15)  Akhil dropped off his Honda Accord to have these Lambo style hinges and other items installed on May 15, 2001 and it took months to finish all the work.  (SOF 16)  Akhil Narang displayed his car with the hinges installed at the 2001 Las Vegas auto parts show.  (See SOF 24)  Akhil's Honda gained much acclaim and was displayed on the cover of many car magazines.  It was displayed on the cover of  the January 2002 Speed Infinity magazine and the June 2002 cover of HCI magazine.  (SOF 17)  The June 2002 HCI magazine has a centerfold photograph of Akhil's Honda with the Streetweapons Composite hinge installed, the doors opened fully up and Daniael Greenbnk's companies stickers prominently displayed on the side window. (SOF 19)

**Page 14 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

The website for Daniel Greenbanks company Street Weapon Composite as it was on May 15, 2001 is available on the internet and viewable through www.archive.org wherein it can be seen advertising the sale of Lambo door hinges. (SOF 18)  Greenbank installed another set of Streetweapons Composite hinges on a car for Mike Cherubim between November 26, 2001 and April 11, 2002.  (SOF 20) The Streetweapons Composite hinge is the same in design and structure as the current GT Factory hinge except the GT Factory hinge is a mass quality version that is stronger. It remained the same basic design and idea. (SOF 21) In all Dan Greenbank built and sold at least three Streetweapons Composite hinges before the critical date of November 25, 2001

Dan Chase worked as an intern at Street Weapon Composites for Dan Geenbank in the fall and winter of 2001/2. (SOF 22)  Dan Chase saw the GT Factory hinges installed on Akhil Narang's Honda in the Streetweapon Composite shop in the fall of 2001. (SOF 23)  Dan chase brought car parts to Akhil Narang at a Las Vegas car show in the fall of 2001.  At that time the car had GT Factory hinges fully installed. (SOF 24)  A couple of months after he began work Dan Chase saw photo exhibits GTF 7, 8 and 9 showing Lisa Mai's car in a photo album in Dan Greenbank's office[4].  (SOF 25) During Dan Chase's 2001 internship and his 2002 internship he witnessed Dan Greenbank and/or his employees doing installations of the Lambo style hinges on customer cars.  (SOF 26)

It is clear from the uncontroverted statements of fact (SOF 1 - 26) (amply supported by invoices, pictures, a web site and corroborating witnesses) Daniel Greenbank, built, sold and installed his allegedly infringing LAMBO hinge by August 11, 2000 which is approximately two years and three months before the November 26,

---

[4] These are the exact same photographs of Lisa Mai's car used by Daniel Greenbank as Exhibits for his deposition and referred to in SOF 12 and 13.

**Page 15 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

2002 filing date of the '547 patent.[5]

Additionally, based on the evidence of Victor Thanapanich's hinges, (amply supported by invoices, pictures and corroborating witnesses) Daniel Greenbank sold and installed his allegedly infringing LAMBO hinge by July 1, 2001 which is approximately one year and five months before the November 26, 2002 filing date of the '547 patent.

Furthermore, based on the evidence of Akhil Narang's hinges, (amply supported by invoices, pictures, magazine covers and corroborating witnesses) Daniel Greenbank sold and installed his allegedly infringing LAMBO hinge by the time of the Las Vegas car show in October, 2001 which is approximately one year and one month before the November 26, 2002 filing date of the '547 patent and the priority date of the '655 patent.

Lastly, based on the evidence of Mike Sharobiem's hinges (amply supported as well) Daniel Greenbank sold and installed his allegedly infringing hinges between November 26, 2001 and April 11, 2002 which is seven months before the priority filing date of the '655 Patent.

The Every Element Test for anticipation requires the presence of each and every element of a claimed invention in a single prior art disclosure. *Dow Chemical Co. v. American Cyanamid Co.*, 816 F2d 617, 624 (Fed. Cir, 1987), *cert. den*. 484 US 849. However, if infringement of the Greenbank (or GT Factory) hinge is pled by VDI and not controverted by THG (which it is not here) then it it is an uncontroverted fact that each and every element of the allegedly infringed claims are present in the Greenbank hinge. That which would literally infringe if later in time, anticipates if earlier than the date of the invention. *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F2d 744, 747 (FedCir, 1987.) Clearly claim 1 is anticipated by the Street Weapons Composite hinge under 35 USC § 102 (b) by the Mai, Thanapanich, and Narang hinge installations.

---

[5] Even if the May 20, 2002 filing date of the provisional is accorded to claims 8 - 10, the Greenbank hinge predates this by one year and nine months.

**Page 16 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

Similarly, claim 1 is are anticipated by the Street Weapons Composite hinge under 35 USC 102(a) by the Sharobiem hinge installation.

Anticipation by Statements of Robert Baum and Louie Canole

It is well known that LAMBO style door conversion hinges (interchangebly referred to as vertical door hinges) have been around since about 2000.  (SOF 27) The President of Vertical Doors Inc, Robert Baum in his deposition in New Jersey Case No. 03 CV 3964 (WJM) verifies this with the following statements:

BY MR. CHESKY

 Q:   And who established Vertical Doors, created Vertical Doors?

 BY ROB BAUM (the witness)

A:   The four partners.

Q:   And why was Vertical Doors created?

MR. COHEN:  Objection.  Ambiguous and calls for speculation.

THE WITNESS:  To start another business.

BY MR. CHESKY:

Q:   What type of business?

A:   Automotive, just basically selling vertical doors.

Q:   What are vertical doors?

A:   They're doors that come away from the vehicle chassis and -- and then in a second motion go up forward.

_____

MR. CHESKY:    When did you first see vertical door conversion kits installed in cars at car shows?

ROB BAUM:  Probably -- I'm not going to give an exact date, but I would have to say it was between 2000 -- around middle of 2000 to early 2001.

_____

ROB BAUM:  Well, put it this way:  Like I said, I've -- we've seen the cars vertical for -- since '01.

Louie Cannole's deposition states both that he saw LAMBO style hinges at auto shows back in 2001 and that he also saw GT Factory hinges (or a close approximation thereof) back in 2001 or 2002. (SOF 28)

MR. CHESKY:      -- you didn't become aware of any automobile vertical door conversion kits at show cars in 2002, did you?

MR. COHEN:  Objection.  Ambiguous.

LOUIE CANNOLE:   Didn't you just ask me that question?  You asked me that question.

MR. CHESKY:  The last one was 2001.

LOUIE CANNOLE:  I -- I would -- I did around 2001 and -2 see this before on cars.

_____

MR. CHESKY:  Is it your understanding that the pivot block on this GT Factory door conversion kit was the basis for the dual boss and pivot plate design of the '223 Patent?

MR. COHEN:  Objection.  Ambiguous.

LOUIE CANNOLE:   I don't know that the one we saw was a GT Factory kit.  It looked like what they have now.  At the time -- but I think that's kind of like what Rob kind of went with, as far as the pivot block, but, yeah, we had seen a kit that looked like GT Factory's, but I don't think it was.  I don't know why GT Factory should be in there but--

MR. CHESKY:  When did you and Mr. Baum see this pivot block on a GT Factory door conversion kit?

MR. COHEN:  Objection.  Ambiguous.

LOUIE CANNOLE:  Can't exactly remember the date, but I know it was -- I think it was a car show near San Diego or something like that.

MR. CHESKY:  Do you recall the year?

LOUIE CANNOLE:   I'm going to go back to my claim before, around '01

**Page 18 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

or '02.  I don't know the exact date.

Here the deposition testimony of two of VDI's officers confirm that they were aware that Lambo style hinges had been around more than a year before the priority date of the '655 patent.  Although the structural details of the Lambo style hinges they saw are not in evidence, these admissions under oath confirms the anticipation of Claim 1 of the '655 patent as to the opening steps of a Lambo hinge.

Obviousness by Three Prior Art References

Further, the '655 Patent is invalid under 35 USC §103 for obviousness.  As noted earlier, the subject matter of a claim is considered obvious, and therefore invalid, when the claimed "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  In *KSR International Co. v. Teleflex Inc.*, 550 US 398 (2007) the Court further developed what a person having ordinary skill in the art was and then, with that properly defined, described how obviousness should be determined.

The proper question to ask here is whether a hinge designer of ordinary skill, facing the needs created in the field of endeavor, would have seen a benefit to modifying any of the following prior art bi rotational door hinges to fit on a vehicle.

Gary Gilbertson, at ¶12 of his declaration states: "I have quickly reviewed U.S. Patent Nos. 1,065,406; 4,944,552; and 5,184,422, which are directed to bi-directional hinge mechanisms. These all represent relatively simple mechanical devices which would be known or understood by one of ordinary skill in the art in designing and manufacturing custom vehicle hinges, such as the lambo-style door hinges."

One skilled in the art of vehicle door hinges would look to the art of hinges in general in order to address the problem that the claims found in the '655 Patent are directed.  Namely, the problem to be solved is to rotate the door away from the structure that it is attached along a first axis, then rotate the door away from the doorway along a second axis.

"[A] patent composed of several elements is not proved obvious merely by

**Page 19 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

demonstrating that each of its elements was, independently, known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR International Co. v. Teleflex Inc.*, 550 US 398, 418-19 (2007).  "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under §103."  *Id.* at 421.

It is apparent that inventors had to find a solution to an after-market hinge for vertically opening doors.  In the deposition excerpts of Daniel Greenbank presented earlier it is clear that Lambourghini designed their car around the door opening up directly vertically.  For the after-market design the logical solution was for the door to first go out, then up, to avoid completely redesigning the door and fenders because the door has to move outward horizontally to clear the door jam before the upward motion can begin,)  In the first two of the following three prior art references, the structure and operation of a bi-axial hinge for opening some form of a door is taught. The third patent teaches a bi-rotational hinge with sag adjuster and rotation angle limiters.  In all of these patents the teaching of a method of opening a door fitted with the hinge they teach would be inherent.

U.S. Patent No. 6,086,137 was issued July 11, 2000.  This patent reaffirms the design problem discussed by Dan Greenbank wherein it states,  "[t]he invention

relates to a side door of a passenger vehicle, which for opening purposes, following a sideways movement which moves the side door out of the door aperture, is actuated by auxiliary forces to pivot forwards and upwards..."   See Exhibit 21 to the Declaration of Mark Hubert.

An example of a door opening first along one axis and then along a second axis is contained in U.S. Patent No. 1,065,406, issued June 24, 1913 for a "rotary swing door" for use in silos.  This prior art was **not** considered by the patent examiner in issuing the '655 Patent as is clear on the face of the '655 patent under the heading "References Cited."  See Exhibit 22 to the Declaration of Mark Hubert.  "A rotary hinge especially adapted to be combined with silo doors by the use of which hinge the door may be swung inside a silo and up and back against the inside thereof.  ...  To operate the device it is only necessary to press door B inward until it has cleared the jamb of the door; then rotate the door half around..."  While the motion of the '406 Patent is first in, then "around" it is essentially the same as Claim 1 of the '655 Patent. Anyone of ordinary skill in the art of hinges would see the solution as obvious.

Yet another example is U.S. Patent No. 5,184,422, issued February 9, 1993 for a "swing away manway assembly." See Exhibit 23 to the Declaration of Mark Hubert. This prior art was **not** considered by the patent examiner in issuing the '655 Patent as is clear on the face of the '655 patent under the heading "References Cited."  "A swing away manway assembly for a tubular fluid conveying system having a manway opening in a first horizontal plane, the assembly including a cover disposed in a second parallel plane."  The description is for a manway cover for an opening that is in the horizontal plane, but it would have been obvious at the time of the invention was made in the '655 Patent to a person having ordinary skill in the art that the same could be used where the opening is in  a vertical plane as bound in a conventional vehicle; to rotate the door away from the structure that it is attached along a first axis, the rotate the door away from the doorway along a second axis.

Prior U.S. Patent No. 4,944,552, filed March 17, 1989, issued July 31, 1990 -

**Page 21 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

Stowable Table System (Harris) anticipates claim 1. See Exhibit 23 to the Declaration of Mark Hubert. This prior art was **not** considered by the patent examiner in issuing the '655 Patent as is clear on the face of the '655 patent under the heading "References Cited."  This patent discloses the table trays that are commonly found in first class seats of an airplane. They have a bi rotational hinge that allows the table tray to rotate in the vertical plane of motion until the tray substantially clears its housing body and then to rotate in the horizontal plane of motion until the tray substantially clears the housing opening. It also has two limit stops to adjust sag adjustment and swingarm angle. This bi-rotational hinge functions the same as the hinge of claim 1 in the '655 patent except the entire motion has been translated 90 degrees.

In looking at each of the three prior art citations supporting THG's obviousness contentions it s clear that the  scope and content of the prior art is bidirectional hinge mechanisms that enable horizontal and vertical movement of doors and the such. The differences between the prior art and the claimed invention appear to be just the application from a silo, airplane tray table or manway hatch onto a car door. As pointed out in the declaration of Gary Gilbertson at ¶ 3 and 6 one of ordinary skill in the art would seek design ideas and solutions from areas outside of the automotive industry and would be aware of such other prior art bidirectional hinges.

**Claim 2**

2.    The **method** of claim 1, further comprising installing a hinge between the vehicle door and a vehicle frame of the vehicle, the hinge comprising a chassis mounting plate, a swingarm, and a bidirectional rotation mechanism and a sag adjustment device coupled to at least one of the chassis mounting plate and the swingarm, the installing step comprising:

fastening the chassis mounting plate to the vehicle frame, the chassis mounting plate comprising a first portion of the sag adjustment device;

fastening the swingarm to the vehicle door, the swingarm comprising a second

portion of the sag adjustment device, the bi-directional rotation mechanism allowing motion of the door in the horizontal plan and the vertical plane.

Claim 2 is invalid for several reasons. It is indefinite under §112, ¶2; and non-enabled under §112, ¶1.It is also obvious under 35 USC § 103 by any of the cited prior art supporting the 35 USC§102 and 35 USC§103 invalidating arguments set forth above in light of Gary Gilbertson's Declaration and Dan Greenbank's Declaration Trial Testimony.

Indefiniteness and Non-Enablement

Claim 2 of the '655 Patent is invalid for the same reason Claims 8-10 of the '547 Patent were found to be invalid. The claim is indefinite under §112, ¶2; and non-enablement under §112, ¶1.

Under 35 U.S.C. § 112, ¶ 2, a patentee must particularly point out and distinctly claim the subject matter which the applicant regards as the invention. A claim is which does not reasonably apprise those skilled in the art of its scope is indefinite. See *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F2d 1200, 1217 (Fed.Cir. 1991). A patent claim is invalid if indefinite. *Id.* at 1217; *Acacia Media Technologies Corp. v. New Destiny Internet Group*, 405 FSupp2d 1127, 1132 (NDCal. 2005).

The Manual of Patent Examining Procedures (MPEP)[6] at §706.03(d) details the various USPTO rejections that fall under 35 USC §112, ¶2. Of specific interest herein is the rejection based on omitting "essential cooperative relationships" as fully discussed at MPEP 706.03(d)¶7.34.14. Here a claim must be "rejected under 35 USC

---

[6] "This Manual is published to provide U.S. Patent and Trademark Office (USPTO) patent examiners, applicants, attorneys, agents, and representatives of applicants with a reference work on the practices and procedures relative to the prosecution of patent applications before the USPTO. It contains instructions to examiners, as well as other material in the nature of information and interpretation, and outlines the current procedures which the examiners are required or authorized to follow in appropriate cases in the normal examination of a patent application." Foreword to Revision 7 of the Eighth Edition of the MPEP, dated July 2008. (emphasis added)

**Page 23 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

§112, ¶2, as being incomplete for omitting essential structural cooperative relationships of elements.  Such omission amounting to a gap between the necessary structural connections.  *See MPEP §2172.01."*  A claim that does not interrelate essential elements of the invention as defined in the specification fails to satisfy the requirements of §112, ¶2. See MPEP §2172.01. Definiteness is a question of law. *Id.* at 1380.

Specifically, here dependent Claim 2 of the '655 Patent must fail for indefiniteness. Claim 2 has a fatal flaw.  Nothing in the claim connects the parts. There is no structure that accounts for functional limitation. There is nothing that says the chassis mounting plate is connected to the swingarm through any part or mechanism.  Just as Claim 8 of the '547 Patent failed for indefiniteness, so does Claim 2 of the '655 Patent.

Of specific interest herein is the rejection based on omitting "essential cooperative relationships" as fully discussed at MPEP 706.03(c).  In order for a claim to be enabled, the specification must be sufficient to enable one skilled in the art to practice the claimed invention.  35 U.S.C. § 112, ¶1;  *In re Stephen E. Wright,* 999 F2d 1557, 1561 (Fed.Cir. 1993). A claim which omits matter essential to the invention as described in the specification or in other statements in the record is not enabling. *Application of Mayhew*, 527 F2d 1229  (C.C.P.A. 1976);  M.P.E.P. §2172.01.

As noted above, Claim 2 of the '655 Patent does not "connect the parts" and so it is also invalid for non-enablement.

<u>Obviousness</u>

Daniel Greenbank disclosed this exact method of installing the Street Weapons Composite hinge in his November 27, 2007 deposition in this case at page 121 line 16 to page 123 line 3 (Exhibit 5) when he states:

THE WITNESS:

The hinge system is installed by first removing the top door hinge on the vehicle.  That's generally the area where the GT Factory Diablo door-hinge system is

installed. Typically, there's a portion of the chassis cut that will house the base plate for the hinge system. That base plate is welded into the chassis, and the door plate is welded to the door.

BY MR. HUBERT:

Q:   So let's go through this step by step. So first you are saying you removed the old hinge?

A: Yes, at least the top hinge. You can leave the bottom one on there if you'd like for alignment.

Q: Eventually, does the bottom one get removed?

A: Sure.

Q: So you are eventually going to -- you are going to remove both hinges?

A: Yes.

Q: Okay. So then you fasten part of your hinge to the frame of the car?

A: Yes, the chassis that is on the A pillar above both factory door hinges.

Q: And you fasten part of your hinge to the door?

A: Yes.

Q: And what connects these two parts of your hinge?

A: What connects the two parts of my hinge? A bipivotal mechanism.

Q: Do you mean -- let me rephrase that. Explain what you mean by "bipivotal mechanism."

A: I mean, the thing that's connecting the door to the chassis is a two-part hinge, one that moves horizontally and one that moves vertically, and also features many adjustments and safety controls.

What Daniel Greenbank's testimony and the cited references presented for the invalidity arguments of claim 1 lack is a first portion of a sag adjuster device on the chassis mounting plate and a second portion of a sag adjuster device on the swingarm. However, the December 21, 2007 VOL II Deposition testimony of Daniel Greenbank reinforces that various forms of sag adjustment device one of which utilized a set

screw was utilized in conjunction with the Street Weapon Composite Hinge although this set screw was not relocated from the vehicle chassis to the hinge until 2003 by Mr. Greenbank.  This evidences that sag adjustment devices including set screws were well known in the art and utilized in conjunction with door hinges to prevent horizontal door sagging more than one year before the priority date of the '655 patent.

Excerpt from page 246 line 13 to line 26

Mr. Cohen:

Q: Okay. And this hinge that you've drawn in Exhibit 8001 is an accurate representation of the hinge that was put on the door for Lisa Mai?

Daniel Greenbank:

A: To the best of my ability in the time given, yes.

Q: And also Victor Thanapanich?

A: Yes.

Q: And Mark Sharobiem?

A: Yes, Mike.

Q Mike Sharobiem and Akhil Narang?

A: Yes.

Excerpt from page 255 line 24 to page 259 line 13

Mr. Cohen:

Q: Was there any mechanism on that hinge in Exhibit 8001 to prevent the door from sagging when it was opened out horizontally to prevent it from sagging up and down vertically?

A: The picture in what I just drew in 8001, there is no such device, but that's because it was originally separated, and later on in the production version, it was included in one nice package. That's how it's sold today. So, originally, it was separated.

Q: When you say "originally," do you mean on those four that were placed on the cars in 2000 and 2001?

**Page 26 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

A: Yes.

Q Was it separated? Do you mean it was on there but somewhere else?

A: I mean, the whole point that we are getting at here is that this is something that was not as high-tech and polished as what we sell today. And when it was, you know, not polished and ready for mass production, you know, there were some things that were outboard of this particular unit that I drew.

Q: When you say "outboard," what do you mean?

A: I mean that since -- at this time, we are not mass-producing these and putting it in a convenient little box and shipping it out so that it makes  e v e r y b o d y else's job easier installing this.

Q: When you say "at this time," you are referring to the 8001 hinge?

A: Yeah.

Q: Okay.

A: Since it wasn't beautiful and conveniently packaged for, you know, mass production, then, you know, some things were not directly attached during the production of this hinge itself, although it was attached to the vehicle.

Q: Okay.

A: So I don't know. I guess you could say that even though that mechanism that you just referred to isn't physically attached to what we are looking at here in 8001 during the production of this actual hinge system, you know, they are attached to each other through the chassis.

Q: Was it a pin or bolt, or are you talking about the shock?

A: Well, when we are talking about what stops the door from sagging down --

Q: Yes?

A: -- well, usually, I just simply call that a "stop."

Q: So what was that physically? What was the structure of it? Was it a metal piece, or was it the shock you are talking about?

A: It was a metal piece that was perpendicular to the chassis, and it touched the

lower edge of the    leading edge of the door. And, therefore, the door could not go down too far and sag, like you said, because it was hitting the stop.

Q: So how was that stop connected to the hingethat you drew in 8001, or was it actually connected to it?

A: It was connected through the vehicle's chassis.

Q: Do you mean it was mounted on the chassis?

A: Yeah.

Q: And this hinge in 8001 was mounted on the chassis?

A: Yes. They are both mounted on the chassis.

Q: And the chassis is the thing that connected them together?

A: Yes.

Q: Okay. Was there anything else that connected them together?

A: No, just the chassis. And, later, that would evolve into one more polished and ready-to-install mechanism.

Q: So when the door was opening horizontally --All of these questions now are just referring to Exhibit 8001 --

A: Okay.

Q: -- those hinges that you sold back in 2000 and 2001.

A: Sure.

Q: When the door was opening horizontally, if it was sagging, then the stop would prevent it from sagging; is that right?

A: That's correct.

Q: And what physically was touching that prevented the sagging? So was the edge of the door touching the stop, for example, or was there something else?

A: I think we did it a couple of different ways.

Q: For those four different cars?

A: Yes.

Q: Okay. What ways?

**Page 28 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

A: We were always trying to do things better. But, you know, generally, there might have been something, you know, reinforcing the leading edge of the door. Other implementations might have been, you know, direct contact with the door's metal.

Q: So the first one, can you explain that in more detail? Not the one where it was contacting the door's metal, but any other implementation you referred to.

A: Can I explain it better?

Q: Yeah. I'm just trying to find out what was touching what that actually prevented that vertical sagging when the door opened up horizontally.

A: Yeah. It was a structure attached to the chassis that also pushed against the door.

Q: Was -- did you ever use a screw for that?

A: Yes.

Q: What kind of screw?

A: A set screw.

Q: Is that just like a regular screw?

A: Yeah. It's just a regular screw.

Q: And it was screwed into the chassis?

A: Huh?

Q: Was the set screw screwed into the chassis, then?

A: No. Later, the screw was used bearing directly against the arm from that central block there.

Q: Where is the arm -- where is the central block?

A: I'm sorry. Later on -- later on, I call it my middle block or central adjustments block. Right here, back in the day, I guess this is what we referred to as the upper block because -- the reason why, later on, it's called the "middle block" or "middle adjustments block" is because there's two support blocks. There's one on top and one on the bottom. Right?

**Page 29 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT (Invalidity of '655 Patent)**

Q: Yes, I see it.

A: You know. You are familiar with my current hinge that I sell.

Q: I see that.

A: So that's why we call it the "center block" later on.

Q: So --

A: And, later on, that set screw bears against the arm, which is attached to the
door, instead of bearing against the door directly.

Q: The arm, you mean the swing arm?

A: That's what I mean.

Q: And when you say "later on," is it in one of those four cars or after that?

A: After that.

Q: It's starting in about 2003?

A: Sure.

Further, Gary Gilbertson's declaration clearly reinforces that sag adjustment
devices were well known in the art pre the year 2000 and that they can be modified
to reside on different parts of the hinge.   Gary Gilbertson's declaration at ¶ 8 states:
"In claims 2 and 13 of the '655 patent, a "sag adjustment device is coupled to at least
one of the chassis mounting plate and the swingarm." The use of a "sag adjustment
device" has been well known in the art for years before the year 2000 as a means to
keep the door in the proper plane for operation. Generally, these may be fixed, like a
welded protuberance, or adjustable like a set screw bearing against a surface. It is only
obvious to use a "sag adjustment device" to keep the door of the automobile in proper
alignment as to not damage the vehicle. Generally, a "sag adjustment device" is
installed on what the '655 patent calls the "chassis mounting plate" of an automobile
door hinge; however, it can be modified to reside on different parts of the hinge."

*KSR Int'l Co. v. Teleflex, Inc*., 550 US 398 (2007)set forth the following
guidelines for the determination of obviousness.

"The combination of familiar elements according to known methods is likely

to be obvious when it does no more than yield predictable results." (discussing *United States v. Adams*, 383 U.S. 39, 40 (1966) (the companion case to *Graham*), *Anderson's Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57 (1969), and *Sakraida v. AG Pro, Inc.,* 425 U.S. 273 (1976)).

"If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability."

"One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."

"When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103."

Here, as supported by the testimony and declaration set forth above, it is clear that the location of a prior art sag adjustment device as set forth in claim 2 is just the implementation a predictable variation because it is only the result of a finite number of identified, predictable solutions that a person of ordinary skill has both a good reason to pursue and which is within their technical grasp.  Simply stated, it is this exact type of obviousness that KSR set forth to eliminate.

## Claims 3 and 6

3.     The **method** of claim 2, including the step of preventing motion of the door in the vertical plane when the door is rotated in the horizontal plane until the swingarm clears a stopping pin on the chassis mounting plate.

6.     The **method** of claim 2, wherein rotating the vehicle door in the horizontal plane of motion comprises preventing vertical motion of the vehicle door until the swingarm clears a stopping pin on the chassis mounting plate.

These claims each offer only the additional element of limiting the vertical motion of the door with a stopping pin. THG asserts that these claims are obvious. Preventing vertical motion of the door until it is "safe" to open (i.e. sufficiently clearing the fender to avoid damage) is obvious. Especially when it is a simple solution as a pin. As pointed out in ¶10 of the Gilbertson declaration "The stopping pin, as described and defined in the '655 patent is a well known solution for limiting the vertical motion of the swingarm on automobile door hinges. It would only be obvious to use a rigid "stopping pin" to the stop the motion (vertical or otherwise depending on the application) of the swingarm."

Again here, the guidelines for the detection of obviousness as set forth in KSR make the case of obviousness for us when it says: "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."

**Claim 9**

9.    A **method** for retrofitting a vehicle door hinge connecting a vehicle door to a vehicle frame, comprising:

removing the vehicle door hinge;

fastening a chassis mounting plate to the vehicle frame; and

fastening a swingarm to the vehicle door,

the swingarm being connected to the chassis mounting plate by a bi-directional rotation mechanism that allows the vehicle door to rotate in a horizontal plane and in a vertical plane relative to the vehicle frame.

This claim's elements simply list the three steps of replacing an old vehicle hinge with a new hinge that allows the vehicle door to rotate in a horizontal plane and in a vertical plane relative to the vehicle frame. These steps are: removing the old hinge, attaching the hinge to the frame and attaching the hinge to the door.

Claim 9 is anticipated by the prior art of the Streetweapon Composite hinge and

the installation steps used therewith are both inherent and testified to by Daniel
Greenbank. As pointed out earlier Dan Greenbank invented and manufactured a hinge
that allowed the vehicle door to rotate in a horizontal plane and in a vertical plane
relative to the vehicle frame more than a year before the priority date of the '655
patent. The simple three step method of installing the Street Weapons Composite
hinge would be an inherent disclosure of the structure and operation of this prior art
hinge. Described another way, an inherent disclosure flows naturally from the
teachings of the prior art reference. *MEHL v. Biophile Int'l. Corp.*, 192 F3d 1362,
1365 (Fed.Cir. 1999).

Additionally, in his November 27, 2007 deposition Daniel Greenbank at page
123 lines 4 to 20 discusses an installation of the street Weapons Composite hinge that
has all three of the steps of claim 9.

Mr. Hubert:

Q: When you installed the hinge in Lisa Mai's car, was -- did you follow the
same procedure?

MR. COHEN: Objection.

THE WITNESS: Well --

MR. COHEN: Objection. Ambiguous.

MR. HUBERT: Go ahead and answer if you can.

THE WITNESS: Well, the hinge that was installed in Lisa Mai's car was
welded to the chassis and the door. And in between the chassis and the door was a
dual hinge allowing the door to go out and up.

BY MR. HUBERT:

Q: And did you have to remove the hinge before you installed it?

MR. COHEN: Objection. Ambiguous.

THE WITNESS: Absolutely.

From a common sense viewpoint, the three steps of claim 9 are obvious to one
of ordinary skill in the art and inherent in the art of installing automotive hinges. The

**Page 33 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT (Invalidity of '655 Patent)**

claim element modifier of a "swingarm being connected to the chassis mounting plate by a bi-directional rotation mechanism that allows the vehicle door to rotate in a horizontal plane and in a vertical plane relative to the vehicle frame" existed in the priro art of the Street Weapons Composite hinge.  To retrofit a vehicle with a new hinge, it is only logical and obvious to remove the pre-existing hinge(s).  There is nothing novel in that.  Then it only makes sense to attach the replacement hinge to the vehicle door and the chassis, with the hinging portion (bi-directional rotation mechanism) between the two mounting parts.  The steps taught in Claim 9 are obvious and inherent in the solution to the problem at hand - of having a door go out then up.

**Claim 13**

13.    The **method** of claim 9, further comprising

adjusting a sag adjustment device on at least one of the chassis mounting plate and the swingarm to adjust the vehicle door such that the vehicle door fits with the vehicle frame when the vehicle door is closed.

THG would reiterate its argument put forth for the invalidation of Claim 2 regarding the obviousness of a sag adjustment device mounted as claimed.  This was not the step of inventive genius, rather it was the result of mechanical aptitude stemming from a finite number of identified, predictable solutions to a known problem.

**Claim 16**

16.    A **method** for installing a hinge between a vehicle frame and a vehicle door, the hinge comprising a chassis mounting plate, a swingarm, a bi-directional rotation mechanism connecting the swingarm to the chassis mounting plate, and a swingarm angle adjuster, the method comprising:

fastening the chassis mounting plate to the vehicle frame;

fastening the swingarm to the vehicle door, the bi-directional rotation mechanism allowing rotation of the vehicle door in a horizontal plane and a vertical plane relative to the vehicle frame; and

**Page 34 - THG's MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Invalidity of '655 Patent)**

adjusting the swingarm angle adjuster to adjust an angle of the vehicle door relative to the vehicle frame that is maintained during rotation of the vehicle door in the horizontal plane.

In the Markman order of December 14, 2007 Judge Selna of this Court summarized VDI's interpretation of a swingarm angle adjuster and it's own interpretation of this device.

"Vertical Doors' responds by pointing out that the patent does not always distinguish between the swingarm angle adjuster and the sag adjustment mechanism. (Vertical Doors' Reply Br. in the Howitt case p. 9.) In fact, claims 21 and 25 specifically provide that "the swingarm angle adjuster comprises a sag adjuster screw . . . and a sag adjuster guide," rendering the sag adjustment mechanism synonymous with the swingarm angle adjuster for the purpose of that claim. (*Id.*; '655 Patent 14: 36-38, 65-67.)

The Court agrees with Vertical Doors' that the patent uses the term "swingarm angle adjuster" to potentially encompass functions also fulfilled by the sag adjustment mechanism in various embodiments. However, the Court finds it unnecessary to construe the term "swingarm angle adjuster," because the Court has already construed the constituent term "swingarm" and the remaining constituent terms "angle" and "adjuster" have ordinary meanings which render the scope of the claims clear without further interpretation."

In light of this lack of distinction between a swingarm angle adjuster and a sag adjustment mechanism, THG would reiterate its earlier argument for obviousness of claim 2 based on the additional claim element of a sag adjustment device which THG is now equating to the sag adjustment mechanism.  Claim 17 is obvious in light of the prior art Street Weapons Composite hinge especially when one considers KSR.

Further Gary Gilbertson's declaration at ¶ 9 discusses swingarm angle adjusters where it states: "Claim 16 of the '655 patent refers to the "swingarm angle adjuster." Again, this is well known in the industry as a solution for limiting the travel of the

door relative to the vehicle frame in the door's path of movement to prevent physical interference problems. "Swingarm angle adjusters" are generally just adjustable set screws."

**Claim 17**

17.    The **method** of claim 16, further comprising removing a previous hinge from between the vehicle frame and the vehicle door.

THG contends that this additional element does not add any patently distinguishable element to Claim 16 that is not inherent.  Even those below the level of a person having ordinary skill in the art of designing and fabricating custom auto hinges would inherently know that in order to install a new hinge (regardless of the style) the old hinge has to first be removed.

Again, removing the prior hinge(s) from the door and the vehicle frame is both inherent and obvious.  Any retrofit, or even replacing a "normal" door (e.g. after an accident) would involve removing the original hinge.  There is nothing new or innovative about Claim 17; it is obvious to even some not skilled in the art.

**Claim 19**

19.    The **method** of claim 16 further comprising at least partially counter balancing the weight of the vehicle door with at least one of a coil spring, a gas strut, a hydraulic cylinder, a gas cylinder, and an electrical actuator.

Claim 19 is obvious. Since the door is going to be rotated upward, it needs to be held up by **<u>something</u>** to overcome the force of gravity.  A "coil spring, a gas strut, a hydraulic cylinder, a gas cylinder, and an electrical actuator" might even be all of the ways to hold a vehicle door up so that it does not fall (other than something impractical such as a rope attached to an overhead tree limb).  The Gilbertson Declaration at ¶11 states "Finally, in claim 19 employs a "gas strut." The weight of vehicle doors are commonly counterbalanced with the use of mechanical devices such as springs, struts, hydraulic cylinders, and electrical actuators, when the door is heavy and must be maintained in a raised orientation."

## V. CONCLUSION

Based on all the arguments set forth herein, THG requests that the Court grant THG's Motion for Partial Summary Judgment, and declare claims 1, 2, 3, 6, 7, 9, 13, 17, and 19 of the '655 patent to be invalid.

Dated: August 26, 2010     /s/ Merrisa L. Coleman-Bishop

**MERRISA L. COLEMAN-BISHOP**
State Bar No. 160046
LAW OFFICE OF MERRISA L. COLEMAN-BISHOP
e-mail: MerrisaSJC@aol.com
2242 Camden Ave., Suite 105
San Jose, CA 95124
Telephone: 408-377-1368
Facsimile: 408-377-1439

    /s/ Roy B. Thompson

**ROY B. THOMPSON**, OSB 82501 (*pro hac vice*)
Thompson & Bográn, P.C.
E-mail: roythompson@comcast.net
15938 SW Quarry Rd., Suite B-6
Lake Oswego, OR 97035
Telephone: 503-245-6600
Facsimile: 503-244-8399

    /s/ Mark S. Hubert

**MARK S. HUBERT,** OSB 98256 (*pro hac vice*)
MARK S. HUBERT, P.C.
e-mail: MarkHubert@pacifier.com
2300 SW First, Suite 101
Portland, OR 97201
Telephone: 503-234-7711
Facsimile: 503-224-0092

Attorneys for The Hoffman Group, LLC et al.